UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JOHN A. OLAGUES, ET AL | * | CIVIL ACTION |
| VERSUS | * | NO. 1:17-CV-20287-JEM |
| PHILLIP FROST, M.D., ET AL | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

**MAY IT PLEASE THE COURT:**

**P**laintiffs, John A. Olagues and Ray Wollney, through undersigned counsel, submit this Memorandum in opposition to the Motion filed by defendant, Dr. Phillip Frost ("Frost").

**I.       FACTUAL BACKGROUND**

Frost is the chief executive officer and chairman of OPKO Health, Inc. ("OPKO"). He is the beneficial owner of more than ten (10%) percent of OPKO's stock. Therefore, he is an insider within the meaning of 15 USC §78.

In 2007, Frost acquired eXegenics, Inc. warrants as part of a merger of Froptix Corporation into eXegenics, Inc., the predecessor of OPKO.[1] Frost was an insider of Froptix at the time of the merger. Each warrant allowed Frost to purchase 100 shares of OPKO stock at exercise prices ranging from $0.19 to $1.0466 per warrant. The warrants did not expire until 2017. Then, Frost purchased more than 900,000 shares in OPKO in September through November, 2014. The average purchase price of these shares was $8.30 per share.[2]

---

[1]       See notes to Form 4.

[2]       See SEC Form 4, attached to the Complaint as Exhibit "A."

-1-

On January 31, 2015, Frost exercised these warrants.  Pursuant to the provisions of the warrants, Frost had the choice of exercising them by either paying cash, or by tendering OPKO stock to the company according to a formula based on the market value of the stock at the time of exercise. OPKO had no choice but to accept either one.[3]  Frost chose to pay for the exercise price in stock. He directed OPKO to withhold 906,146 shares to pay for the exercise price of the warrants.  The stock was trading at $11.78 per share at the time.  Frost realized a profit of $3,190,254 from this transaction.[4]  Since this transaction was done on January 31, 2015, it means that Frost purchased OPKO shares and disposed of them within less than a six-month period.  Plaintiffs argue this disposition of shares matched the purchase of shares less than six months prior to this disposition.

The attached graph shows the price movement during and after the purchase and sale.[5]  Frost, as an insider, possessed information concerning OPKO which was unknown to the public.  He realized OPKO's shares would probably decline in value.  By handling the warrant transaction in the manner he did and when he did, Frost was able to dispose of 906,146 shares at $11.78 per share. Unless Frost was concerned that the stock price was going to decline from $11.78, there was no rush to exercise the warrants and sell (i.e., dispose of shares).  The exercise price was fixed and the warrants did not expire for another two years.  However, by exercising the warrants at the stock's peak, Frost was able to reduce his exposure to the expected price decline on 906,146 shares.

---

[3]      See Sections 2.1 and 2.5 of an eXegenics, Inc. warrant form, attached hereto as Exhibit "A."

[4]      See SEC Form 4, attached to the Complaint as Exhibit "A."

[5]      See chart attached hereto as Exhibit "B."

## II.     LAW

### A.     Standard of Review

In *Pfeiffer v. Price,*[6] the district court provided the Standard of Review for F.R.C.P. Rule

12(b)(6) motions:

> "In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept
> as true all material allegations of the complaint and it must construe the complaint
> in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts,
> Inc.,* 140 F.3d 478, 483 (3rd Cir. 1998). 'A complaint should be dismissed only if,
> after accepting as true all of the facts alleged in the complaint, and drawing all
> reasonable inferences in the plaintiff's favor, no relief could be granted under any set
> of facts consistent with the allegations of the complaint." *Id.* Claims may be
> dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate
> any set of facts that would entitle him to relief. See *Conley v. Gibson,* 355 U.S. 41,
> 45-46 (1957). The moving party has the burden of persuasion. See *Kehr Packages,
> Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3rd Cir. 1991). 'The issue is not whether
> a plaintiff will ultimately prevail but whether the claimant is entitled to offer
> evidence to support the claims." *In re Burlington Coat Factory, Sec. Litig.,* 114 F.3d
> 1410, 1426 (3rd Cir. 1997)."

Here, the Complaint alleges Frost violated the insider trading law by purchasing shares and

disposing of them to OPKO within six months without obtaining the necessary approvals required

by the SEC Regulations and Rules.[7] These allegations are taken as true for the purposes of a Rule

12(b)(6) Motion. Defendant claims he had specific board approval, but he did not provide any

evidence to rebut these allegations. Therefore, plaintiffs' allegation that Frost did not have such

approval is taken as true for purposes of this Motion.

---

[6]      USDC Del. 2004 WL 3119780.

[7]      See paragraph 15 of the Complaint.

**B.      Insider Trading**

In order to avoid the evils of insider trading, Congress passed the Securities and Exchange

Act of 1933.  See 15 USCA §78p(b), which provides as follows:

**"(b)      Profits from purchase and sale of security within six months**

"For the purpose of preventing the unfair use of information which may have been
obtained by such beneficial owner, director, or officer by reason of his relationship
to the issuer, any profit realized by him from any purchase and sale, or any sale and
purchase, of any equity security of such issuer (other than an exempted security) or
a security-based swap agreement involving any such equity security within any
period of less than six months, unless such security or security-based swap agreement
was acquired in good faith in connection with a debt previously contracted, shall
inure to and be recoverable by the issuer, irrespective of any intention on the part of
such beneficial owner, director, or officer in entering into such transaction of holding
the security or security-based swap agreement purchased or of not repurchasing the
security or security-based swap agreement sold for a period exceeding six months.
Suit to recover such profit may be instituted at law or in equity in any court of
competent jurisdiction by the issuer, or by the owner of any security of the issuer in
the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit
within sixty days after request or shall fail diligently to prosecute the same thereafter;
but no such suit shall be brought more than two years after the date such profit was
realized.  This subsection shall not be construed to cover any transaction where such
beneficial owner was not such both at the time of the purchase and sale, or the sale
and purchase, of the security or security-based swap agreement or a security-based
swap involved, or any transaction or transactions which the Commission by rules and
regulations may exempt as not comprehended within the purpose of this subsection."

Because of the danger of corporate insiders using inside information to generate profits from

short-term buying and selling of their company's stock, Congress imposed strict liability for profiting

from purchases and sales made within six months of each other, and allowed Securities and

Exchange Commission ("SEC") exemptions only for transactions not comprehended within the

purpose of the statute.[8]

---

[8]      *Magma Power Co. v. Dow Chemical Co.,* 136 F.3d 316 (2d Cir. 1998).  See also
*Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464
(1976).

Thereafter, the SEC promulgated regulations which provide a "safe harbor" for certain transactions by an insider.  See 17 CFR 240.16b-3, which provides, in pertinent part, as follows:

"(a) *General.*  A transaction between the issuer (including an employee benefit plan sponsored by the issuer) and an officer or director of the issuer that involves issuer equity securities shall be exempt from section 16(b) of the Act of the transaction satisfies the applicable conditions set forth in this section.

"...

"(d) Acquisitions from the issuer.  Any transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt if:

"(1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;

"(2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or

"(3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, *provided that* this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

"(e) *Dispositions to the issuer.*  Any transaction, other than a Discretionary Transaction, involving the disposition to the issuer of issuer equity securities, whether or not intended for a compensatory or other particular purpose, shall be exempt, provided that the terms of such disposition are approved in advance in the manner prescribed by either paragraph (d)(1) or paragraph (d)(2) of this section.

**"(f) *Discretionary Transactions.*** A Discretionary Transaction shall be exempt only if effected pursuant to an election made at least six months following the date of the most recent election, with respect to any plan of the issuer, that effected a Discretionary Transaction that was:

> **"(1)** An acquisition, if the transaction to be exempted would be a disposition; or
>
> **"(2)** A disposition, if the transaction to be exempted would be an acquisition.

"..."

Note (3) to this Regulation provides:

**"Note (3):**

"The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan. Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval."

The starting point in determining whether a transaction is exempt from §16(b) is to determine whether the transaction is comprehended within the purpose of this subsection. If the transaction is comprehended within the purpose of this subsection, it matters little what type of approval has been obtained since the transaction cannot be exempt.

In this case, Frost had an advantage over OPKO because Frost could choose when he could exercise the warrants and the manner in which he paid for them, i.e., by tendering stock or paying cash. OPKO had no choice but to accept the stock tender that was chosen by Frost.

The leading Supreme Court case concerning violations of §16(b) of the Securities and Exchange Act of 1934 is *Kern County Land Company v. Occidental Petroleum Corporation*,[9] in which the petitioner sought to recover by suit a profit of some $19,000,000 which the respondent had made in a merger between Kern County Land Company and Tenneco Petroleum Company.  In discussing the statute, the Supreme Court noted:

> "The statute requires the inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within a specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of this such information... Thus, '(I)n interpreting the terms of 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse."[10]

In ruling for the defendant, Occidental Petroleum, the court held that Occidental had no choice with respect to the future of the shares it acquired.  Contrast the position of Occidental Petroleum with Frost.  Frost had complete discretion of how to handle the transaction and control over OPKO.  OPKO had no choice but to accept Frost's direction.

In *Analytical Surveys, Inc. v. Tonga Partners, L.P., et al*,[11] Analytical Surveys, Inc. ("ASI") filed suit against three defendants seeking a disgorgement of profit pursuant to §16(b).  ASI had issued a convertible note to Tonga.  The note provided that at maturity, Tonga had the option to convert the principal balance into shares of ASI, but could, if it wished, insist on payment in full in cash.  Tonga then converted the outstanding principal of this note into stock in ASI.  Within six

---

[9]     411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed2d 503 (1973).

[10]    At pp. 594 and 1744.

[11]    684 F.3d 36 (2d Cir. 2014).

months, it sold the stock for a profit on the open market. These facts sound very similar to the case at bar.

In citing *Kern County,* the *ASI* court held that *Kern County* defense to §16(b) only applied "when the transaction at issue is 'an (1) involuntary transaction by an insider; (2) having no access to insider information."[12] The court held for the plaintiff.

## III.  CONCLUSION

The court should deny the defendant's Motion to Dismiss.

Dated: May 18, 2017                         Respectfully submitted,

                                      **LAW OFFICE OF KEVIN C. SCHOENBERGER**

                      By:    */s/ Kevin C. Schoenberger*
                             **KEVIN C. SCHOENBERGER (Bar No. 11813)**
                             Attorney for the Plaintiffs
                             201 St. Charles Avenue
                             Suite 2422 - Place St. Charles
                             New Orleans, Louisiana 70170
                             Telephone: (504) 525-1143
                             Facsimile: (504) 587-0901
                             Email: kcschoenberger@gmail.com

                                      **LAW OFFICE OF CONRAD WILLKOMM, PA**

                      By:    */s/ W. Conrad Willkomm*
                             **W. CONRAD WILLKOMM (Bar No. 0697338)**
                             3201 Tamiami Trail North - 2nd Floor
                             Naples, Florida 34103
                             Telephone: (239) 262-5303
                             Facsimile: (239) 262-6030
                             Email: conrad@swfloridalaw.com

---

[12]      At p. 45.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JOHN A. OLAGUES, ET AL | * | CIVIL ACTION |
| VERSUS | * | NO. 1:17-CV-20287-JEM |
| PHILLIP FROST, M.D., ET AL | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 18, 2017, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF electronic document filing system which will send a notice of

electronic filing to the following:

Tracy A. Nichols, Esq.
Holland & Knight, LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 789-7717
Facsimile: (305) 789-7799
tracy.nichols@hklaw.com

*Attorney for OPKO Health, Inc.*

Peter W. Homer, Esq.
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5139
Facsimile: (305) 982-0063
phomer@homerbonner.com

*Attorneys for M.D. Phillip Frost*

/s/ W. Conrad Willkomm
**W. CONRAD WILLKOMM**